**Christine FRANKLIN,
Plaintiff–Appellant,**

v.

**The GWINNETT COUNTY PUBLIC SCHOOLS, a Local Education Agency (LEA), Dr. William Prescott, An Individual, Defendants–Appellees.**

No. 89–8393.

United States Court of Appeals,
Eleventh Circuit.

Sept. 10, 1990.

---

Michael Weinstock, Stephen M. Katz, Weinstock & Scavo, P.C., Atlanta, Ga., for plaintiff-appellant.

E. Freeman Leverett, Heard, Leverett & Phelps, Elberton, Ga., for amicus, Georgia School Boards Assoc., Inc.

Frank C. Bedinger, III, Alan R. Heath, Freeman & Hawkins, Atlanta, Ga., for Gwinnett County Public Schools and Dr. William Prescott.

Walt M. Britt, Pruitt & Britt, Buford, Ga., Arnold Wright, Jr., Atlanta, Ga., for Dr. William Prescott.

Victoria Sweeny, Tennant, Davidson, Thompson & Sweeny, P.C., Lawrenceville, Ga., for Gwinnett County Public Schools.

David R. Boyd, J. Dorman Walker, Jr., Balch & Bingham, Montgomery, Ala., for amicus Alabama Ass'n of School Boards.

Before JOHNSON, Circuit Judge, HILL[*] and HENLEY[**], Senior Circuit Judges.

HENLEY, Senior Circuit Judge:

Christine Franklin appeals from the district court's[1] dismissal of her action pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted.[2] We affirm.

Franklin brought the action under Title IX of the Education Amendments of 1972 (codified as amended at 20 U.S.C. §§ 1681–1688 (1988)) ("Title IX"), seeking damages against Gwinnett County Public Schools ("Gwinnett"), and Dr. William Prescott, contending that she had been intentionally discriminated against because of her gender. Gwinnett filed a motion to dismiss, arguing, *inter alia*, that compensatory relief is unavailable for violations of Title IX of the Education Amendments of 1972.

According to her complaint, Franklin attended North Gwinnett High School, Gwinnett County Public School District, in the State of Georgia. In September of 1986, Coach Andrew Hill, Franklin's economics teacher, became friends with her. Indications of this friendship included Franklin being allowed to grade class papers, private meetings between her and Hill during and between classes, notes written by Hill authorizing her late admittance to other classes, and private visits by her and Hill to Hill's office, which was separated from the main school building.

According to the complaint, during this period of time Hill initiated with Franklin discussions of a sexual nature. Dr. William Prescott, band director at the school, was told by Douglas Kreeft, Franklin's boyfriend, about these discussions. Franklin was excused from several classes at the request of Hill. At one point after an argument in the school parking lot, Hill grabbed Franklin and kissed her. In October of 1987, an assistant principal was told by other students of "involvement" between Hill and Franklin. The student was "admonished." During this period of time, certain female students indicated to teachers and a guidance counsellor at the school that Hill was directing sexual remarks at other female students as well.

Ultimately, according to the complaint, Hill and Franklin engaged in two or three episodes of sexual intercourse on school grounds between October and December of 1987. On February 29, 1988, the school's principal was informed of the alleged sexual activity between Hill and Franklin.

Franklin alleged that after she reported the above circumstances to school authorities Prescott tried to discourage her from pursuing the matter by talking to her about the negative publicity which could

---

[*] *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

[**] Honorable J. Smith Henley, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

[1.] The Honorable Orinda D. Evans, United States District Judge, Northern District of Georgia.

[2.] In support of Franklin, the National Women's Law Center submitted a brief on behalf of numerous interested parties; in support of Gwinnett, the Georgia School Boards Association and the Alabama Association of School Boards have submitted amicus briefs.

result. Prescott also spoke to Kreeft in an effort to enlist his assistance to discourage Franklin from pursuing the matter. Sometime between March 2 and March 14, 1988, Gwinnett began an investigation. At the termination of the 1987–88 school year, Hill resigned and Prescott retired. At this point, Gwinnett closed its investigation.

In August of 1988, Franklin filed a complaint against Gwinnett with the Office of Civil Rights ("OCR"), United States Department of Education, alleging that she had been subjected to sexual discrimination in violation of Title IX.[3] Following a six-month investigation, OCR found Gwinnett in violation of Title IX.[4] However in a December 14, 1988 letter signed by its regional director and addressed to Franklin's counsel OCR stated that due to assurances of affirmative actions designed to prevent any future violations it considered Gwinnett as of that date in compliance with Title IX. Therefore, the OCR investigation was closed.

■ In the context of a motion to dismiss, we accept as true facts alleged in a complaint and construe them in a light favorable to the plaintiff. *E.G., Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp.*, 711 F.2d 989, 994–95 (11th Cir.1983). The parties agree and cases have held that Title VI of Civil Rights Act of 1964 (codified as amended at 42 U.S.C. §§ 2000d to d–4 (1988)) ("Title VI"),[5] served as the legislative antecedent for Title IX,[6] and that consequently, the jurisprudential analysis of the Justices' opinions in *Guardians Association v. Civil Service Commission*, 463 U.S. 582, 103

S.Ct. 3221, 77 L.Ed.2d 866 (1983), which construed Title VI (and upon which both parties rely), as well as the analysis of other Title VI cases, is applicable in a Title IX context. *See Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

Title IX was patterned after Title VI of the Civil Rights Act of 1964. Except for the substitution of the word "sex" in Title IX to replace the words "race, color, or national origin" in Title VI, the two statutes use identical language to describe the benefitted class. Both statutes provide the same administrative mechanism for terminating federal financial support for institutions engaged in prohibited discrimination.

*Id.* at 694–96, 99 S.Ct. at 1956–57. Hereinafter we discuss Title VI and Title IX cases somewhat interchangeably, because we believe it is settled that analysis of the two statutes is substantially the same.

■ For purposes of this case, it is undisputed that an implied private right of action exists under Title IX. *See Cannon*, 441 U.S. 677, 99 S.Ct. 1946. However, it is clear that the question "whether a litigant has a 'cause of action' is analytically distinct and prior to the question of what relief, if any, a litigant may be entitled to receive." *Davis v. Passman*, 442 U.S. 228, 239, 99 S.Ct. 2264, 2274, 60 L.Ed.2d 846 (1979). Consequently, the existence of a cause of action by no means assures a right to an unlimited array of remedies.

In *Drayden v. Needville Indep. School Dist.*, 642 F.2d 129 (5th Cir.Unit A April 1981), discharged black teachers filed suit

---

**3.** The Department is charged with promulgating and enforcing regulations pursuant to Title IX. *See* 34 C.F.R. §§ 106.1–106.71 (1989).

**4.** Specifically, Gwinnett was found in violation of 34 C.F.R. §§ 106.-8, .31(a), .31(b)(2), .31(b)(4), .31(b)(7), .71 (1989).

**5.** Section 601 of Title VI provides the following:
  No person in the United States shall, on the basis of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Pub.L.No. 88–352, tit. VI, § 601, 78 Stat. 252 (1964) (codified at 42 U.S.C. § 2000d (1988)).

**6.** Section 901(a) of Title IX provides the following:
  No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

Pub.L.No. 92–318, § 901(a), 86 Stat. 373 (1972) (codified at 20 U.S.C. § 1681(a) (1988)).

under Title VI and other civil rights statutes alleging civil rights violations against a school district for which they had worked, seeking declaratory and injunctive relief and damages. In affirming the dismissal of the action, the court held that the "private right of action allowed under Title VI encompasses *no more* than an attempt to have any discriminatory activity ceased." *Id.* at 133 (emphasis added); *see also Lieberman v. University of Chicago,* 660 F.2d 1185, 1188 (7th Cir.1981) (affirming summary judgment against plaintiff who sought damages under Title IX for discriminatory medical school admissions policies, noting that it is for Congress, not the courts, to create a right to damages), *cert. denied,* 456 U.S. 937, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982).

Since decisions of the former Fifth Circuit rendered prior to October 1, 1981 represent binding precedent for this court, *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), we find it clear that *Drayden* constituted this circuit's view on the matter of compensatory damages under Titles VI and IX prior to *Guardians Association,* a case to which we now turn.

In *Guardians Association,* petitioners black and Hispanic police officers of the City of New York, brought a class action lawsuit against the Civil Service Commission alleging their layoffs constituted civil rights violations under, *inter alia,* Title VI. The district court awarded constructive seniority, with monetary and nonmonetary entitlements, and certain other relief. The court of appeals reversed on the issue of damages, holding that intentional discrimination—which had not been found by the trial court—was required for relief under Title VI.

A fragmented Supreme Court affirmed the judgment of the court of appeals. A fair reading of the various opinions discloses that a majority of Justices agreed that discriminatory intent is not a prerequisite to relief under Title VI, *see Guardians Association,* 463 U.S. at 584 & n. 2, 103 S.Ct. at 3223 & n. 2 (opinion of White, J.), but that "at least five justices would not allow *compensatory* relief to a private plaintiff under Title VI absent proof of discriminatory intent." *Manecke v. School Bd. of Pinellas County, Fla.,* 762 F.2d 912, 922 n. 8 (11th Cir.1985), *cert. denied,* 474 U.S. 1062, 106 S.Ct. 809, 88 L.Ed.2d 784 (1986).

At the outset, we concede some difficulty in application of *Guardians Association* to the instant dispute, given the various opinions therein. In this regard, we note the comments of Justice Powell that the Court's several "opinions [in *Guardians Association*] ... will further confuse rather than guide." 463 U.S. at 608, 103 S.Ct. at 3235. And though *Guardians Association* has been described as "a badly fragmented decision," *see id.,* we nevertheless have looked to it for guidance.

In announcing the judgment of the *Guardians Association* Court, Justice White concocted an opinion which only Justice Rehnquist joined. Noting that there had been no showing of intentional discrimination, Justice White "put aside" the question of damages in hypothetical circumstances involving intentional discrimination. 463 U.S. at 597, 103 S.Ct. at 3229. Justice White added, however, that "it *may* be that the victim of the intentional discrimination should be entitled to a compensatory award...." *Id.* (emphasis added).

Justice Powell, joined by Chief Justice Burger, found no implied cause of action *at all* under Title VI. *See id.* at 608–11, 103 S.Ct. at 3235–37 (Powell, J., concurring in judgment). It follows logically that the Justices did not believe damages could be sought, where no cause of action could lie in the first place. Finally, Justice O'Connor also concurred in judgment, concluding that no relief of any kind was available without intentional discrimination. She therefore did not reach the issue of whether a private cause of action for damages would lie. *See id.* at 612 n. 1, 103 S.Ct. at 3238 n. 1 (O'Connor, J., concurring in judgment).

In dissent, Justice Marshall took the position that compensatory relief is available to a private Title VI plaintiff without a showing of intent to discriminate. *See id.* at

624–34, 103 S.Ct. at 3244–49 (Marshall, J., dissenting). Justice Stevens in dissent, with Justices Brennan and Blackmun joining, also determined that compensatory damages were available. *Id.* at 635–39, 103 S.Ct. at 3250–52 (Stevens, J., dissenting).

As we read this case, five members of the Court, White, Rehnquist, Powell, Burger and O'Connor, concluded that either the question of compensatory relief for intentional discrimination under Title VI was open (White, Rehnquist, O'Connor), or no private cause of action under Title VI exists at all (Powell, Burger). In contrast, only four Justices, Marshall, Stevens, Brennan, and Blackmun, believed such relief was available.

Both Franklin and Gwinnett argue, at various points in the briefs, that *Guardians Association* is dispositive of the issue before us. Franklin, on the one hand, argues that the analysis of *Guardians Association* implicitly overruled *Drayden*, while Gwinnett on the other disagrees. We think Franklin reads too much into *Guardians Association.*

Although it seems clear that the judgment of *Guardians Association* precludes a cause of action for compensatory damages for *unintentional* discrimination, we believe the various opinions of a majority of the Justices simply leaves *open* the question whether compensatory damages for intentional discrimination may be sought. We do not read *Guardians Association* to hold that because no damages may be sought for unintentional discrimination, this necessarily leads to the inevitable conclusion that where *intentional* discrimination is shown, a damages remedy is possible. The question is simply open, and thus the inferior courts are free, checked only by the constraints within their respective spheres of authority, to act as they deem appropriate.

Justice White's opinion in *Guardians Association* provides other important guidance which assists in resolving the case before us. Justice White analyzed the nature of Title VI itself, viz, a statute enacted pursuant to the Spending Clause, *see* 463 U.S. at 598, 103 S.Ct. at 3230 (opinion of White, J.), as well as the "limited remed[ies]" which may flow from such legislation, *see id.* at 599, 103 S.Ct. at 3231. Under such statutes, relief may frequently be limited to that which is equitable in nature, with the recipient of federal funds thus retaining the option of terminating such receipt in order to rid itself of an injunction. *See id.* at 596, 103 S.Ct. at 3229. Moreover, with such statutes the Supreme Court has not required a defendant to "provide money to plaintiffs, much less required [a defendant] to take on … open-ended and potentially burdensome obligations…." *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 29, 101 S.Ct. 1531, 1546, 67 L.Ed.2d 694 (1981). Finally, "[s]ince the private cause of action … is one implied by the judiciary rather than expressly created by Congress, we should respect the … considerations applicable in Spending Clause cases and take care in defining the limits of this cause of action and the remedies available thereunder." *Guardians Ass'n,* 463 U.S. at 597, 103 S.Ct. at 3230.

Franklin argues, as does the National Women's Law Center, that the Civil Rights Remedies Equalization Amendment (codified at 42 U.S.C. § 2000d–7 (1988)), enacted in 1986, demonstrates that Title VI was passed pursuant to both the fourteenth amendment and the Spending Clause. This being true, a more liberal view of the damages question is in order, they contend. We disagree. The language of the statute, as far as we can tell, has no direct bearing on the question whether a cause of action for money damages will lie. Instead, the language only eliminates the sovereign immunity of States under the eleventh amendment in response to *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985).[7] The

7. The Civil Rights Remedies Equalization Amendment provides the following:
  (1) A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 794 of Title 29, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975 [42 U.S.C.A.

legislation makes clear that States may now be sued under Title IX and other named statutes to the same extent that other entities may be sued under the statutes. But it does not directly address the question whether money damages can be had under Title IX, nor does it suddenly change the original authority under which Congress passed the legislation, from that of the Spending Clause, to the fourteenth amendment.

Title IX, like Title VI, is Spending Clause legislation. Therefore, we proceed with extreme care when we are asked to find a right to compensatory relief, where Congress has not expressly provided such a remedy as a part of the statutory scheme, where the Supreme Court has not spoken clearly, and where binding precedent in this circuit is contrary.

We do not believe we are constrained by *Guardians Association* on the issue of compensatory damages for intentional discrimination. Nevertheless, we do remain bound to apply the law of this circuit, which includes precedent of the Fifth Circuit handed down prior to the formation of this circuit. *See Bonner*, 661 F.2d at 1207. Because we conclude above that the Supreme Court has not overruled *Drayden* either explicitly or implicitly, we are bound to follow *Drayden's* mandate that damages are unavailable under Titles VI and IX.

■ Finally, we note that Franklin has invited this court to apply a Title VII[8] analysis to this case. Titles VI and IX, as well as Title VII, all have an antidiscrimination purpose. But while Titles VI and IX speak in terms of conditional grants which may be terminated if discrimination

occurs under any federally funded program, Title VII (which we find unnecessary to extensively analyze for these purposes) speaks in terms of outright prohibitions, making discrimination in an employment setting an unlawful employment practice. *See, e.g.* 42 U.S.C. § 2000e–2. We do not believe applying Title VII to Title IX would result in the kind of orderly analysis so necessary in this confusing area of the law. For this reason, we decline to do so.

With regard to the question of the liability of Dr. William Prescott as an individual, insofar as we can tell, Franklin has abandoned this issue on appeal. There is no substantive discussion of the issue in her briefs, and the issue was not touched on by counsel at oral argument. For these reasons, we do not find it necessary to consider the issue.[9]

For the reasons set out above, we AFFIRM the decision of the district court.[10]

JOHNSON, Circuit Judge, concurring specially:

*Guardians Association* is indeed a fragmented opinion. In divining a rule of law from it to address the situation now before this Court, we must consider the holding of the case to be the " 'position taken by those Members who concurred in the judgments on the narrowest grounds.' " *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169, 96 S.Ct. 2909, 2923, 49 L.Ed.2d 859 n. 15 (1976)). *See also Martin v. Dugger*, 891 F.2d 807, 809 n. 2 (11th Cir.1989). In reaching the result in *Guardians Association*, five Members of the Court concluded

§ 6101 et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.], or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

(2) In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State. 42 U.S.C. § 2000d–7 (1988).

**8.** 42 U.S.C. §§ 2000e to e–17 (1988).

**9.** We do, however, note that the Sixth Circuit has found there is no right to proceed against an individual under Title IX. *See, e.g., Leake v. University of Cincinnati*, 605 F.2d 255, 259–60 (6th Cir.1979).

**10.** We do not here reach the question of any legal rights which Franklin may or may not have under either (1) state law or (2) any federal statute other than Titles VI or IX. Any question in this regard must be considered on its own merits and in another setting.

that the appellants could not be awarded compensatory relief without a showing of intentional discrimination. *See Guardians Association,* 463 U.S. at 606–07, 103 S.Ct. at 3234–35 (White, J., announcing judgment of the Court, joined by Rehnquist, J.); *id.* at 610–11, 103 S.Ct. at 3236–37 (Powell, J., concurring, joined by Burger, C.J., and Rehnquist, J.); *id.* at 615, 103 S.Ct. at 3239 (O'Connor, J., concurring). This was the narrowest conclusion resulting in judgment and is therefore the rule to be drawn from the case. The many other suggestions made by the various concurrences and dissents regarding the kinds of remedies available under Title VI and the proof needed to achieve those remedies must be considered dicta. The opinions of Justices White and O'Connor specifically put aside the question of whether under Title VI damages may be awarded those suffering intentional discrimination. The opinions of Justices Marshall and Stevens indicate their preference to award compensatory relief to victims of discrimination under Title VI whether or not those victims can show purposeful discrimination, but their statements do not constitute an intervening rule of law which overrules the precedent of our Circuit. Until the Supreme Court or an en banc court of our own Circuit says otherwise, *Drayden* is binding precedent and we must follow it. *United States v. Machado,* 804 F.2d 1537, 1543 (11th Cir.1986) (stating that "[o]nly a decision by this court sitting en banc or the United States Supreme Court can overrule a prior panel decision").

I concur specially because I believe that *Drayden* alone is dispositive of this case. It is not necessary therefore to address the issues of whether Titles VI and IX are grounded solely in the Spending Clause or whether Title VII analysis should apply to an action under Title VI or Title IX.